**ORDERED.**

**Dated:  February 20, 2026**

_____

Jason A. Burgess
United States Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT
# MIDDLE DISTRICT OF FLORIDA
# JACKSONVILLE DIVISION

IN RE:                                                    Case No.: 3:25-bk-03661-BAJ

Marietta Animal Hospital, Inc.                            Chapter 7

                        Debtor.
_____/

## FINDINGS OF FACT AND CONCLUSIONS OF LAW
## GRANTING MOVANT'S MOTION TO DISMISS

This Case came before the Court for trial on November 17, 2025, upon the *Motion to Dismiss Chapter 7 Bankruptcy Case Due to Fraud in the Filing of the Petition* (Doc. 15) (the "Motion") filed by, Shirley W. Spooner, as Trustee of the Shirley Weedman Spooner Revocable Trust U/A/D April 1, 2016 ("Movant").

The issue for the Court's determination is whether the Debtor was wrongfully placed into Chapter 7 by an individual who did not have the corporate authority to sign the petition. The signing of a bankruptcy petition as the corporate representative is a serious matter, and as the Court

has previously stated, "the confines of the bankruptcy court should *never* be misappropriated as a vessel to unabashedly force a Debtor into bankruptcy without the corporate authority to do so."[1]    For the reasons set forth below, the Court finds that the petition was not signed with valid corporate authority, and therefore the Case must be dismissed.

## Findings of Fact

On October 9, 2025, a voluntary petition under Chapter 7 of the United States Bankruptcy Code was filed by the Debtor.[2]    The petition was signed by Kelli Sanders ("Dr. Sanders"), as the individual claiming corporate authority to file the petition.[3]    Dr. Sanders also works as a veterinarian at the animal hospital operated by the Debtor.

The Movant, who is a creditor of the Debtor,[4] disputes that Dr. Sanders is vested with the corporate authority to file the petition.  The Movant alleges that Dr. Sanders sold the Debtor in January of 2023 to MAH Thankful, LLC ("MAH"), owned by Elizabeth Arflin and Allen Suggs.[5] The Debtor, through Dr. Sanders, disputes this ownership and alleges that the closing of the sale was never consummated because the full purchase price was not paid.

For purposes of this matter, the lineage of who is vested with the rightful corporate authority of the Debtor, dates back to January of 2019, when Dr. Sanders and her then business

---

[1] <u>In re Monroe & King, P.A.</u>, Case No. 3:24-bk-02526-BAJ, Doc. 19, p. 1 (Bankr. M.D. Fla. Dec. 12, 2014).

[2] In 1996, the Debtor was established upon the filing of Articles of Incorporation (the "AOI").  The AOI provides that there is a total of 100,000 shares which the corporation may issue, and that each share of common stock shall have equal and full voting power and rights. Based on public record, the Debtor's AOI have never been amended. Additionally, there were no bylaws of the Debtor introduced into evidence.  <u>Articles of Incorporation for Marietta Animal Hospital, Inc.</u>, (filed October 4, 1998) (Fla. Dept. of State, Div. of Corps.); <u>Milliken v. Kranz Tree Serv., Inc.</u>, No. 6:08–cv–822–Orl–28–DAB, 2008 WL 4469882 at *1 n.1 (M.D. Fla. Oct. 2, 2008) (A court may take judicial notice of records of the State of Florida, Division of Corporations.).

[3] The Petition lists Dr. Sanders as the President of the Debtor. (Movant's Ex. 9, p. 4).

[4] The Movant is listed on the Debtor's schedules as a nonpriority unsecured creditor for a business loan in the amount of $650,000, as well as an unknown amount for a deficiency on a mortgage. (Movant's Ex. 9, p. 19). The Movant maintains that the Loan is not a debt owed by the Debtor because Dr. Sanders signed the loan in her personal capacity. The Court, however, need not address this issue because the Case will be dismissed.

[5] Movant's Ex. 3, p. 10.

partner, Jeffery T. Richardson, purchased the Debtor (the "Initial Purchase"), and became the sole

shareholders.[6] The Initial Purchase is memorialized in a $650,000 Promissory Note (the "Note")[7]

signed by Dr. Sanders, in her *individual* capacity, and Mr. Richardson in favor of the Movant as

the payee.[8]  Additionally, a Stock Pledge Agreement (the "Pledge Agreement") was executed in

which Dr. Sanders pledged her 250 shares of common stock in the Debtor to the Movant as security

for the indebtedness owed under the Note.[9]  Notably, there was a 2017 promissory note for

$1,316,000 (the "2017 Note") in existence at the time of the Initial Purchase.  The 2017 Note is

in the name of the Debtor and is secured by an amended and restated mortgage on the real property

the Debtor operates its business on.[10]

      In May of 2020, Dr. Sanders became the sole shareholder when Mr. Richardson executed

a Stock Assignment and Stock Power, which transferred and assigned his 250 shares of common

stock to the Debtor.[11]  In July of 2020, the Annual Report was updated to reflect Dr. Sanders as

the sole shareholder of the Debtor.[12]

---

[6] Dr. Sanders and Mr. Richardson purchased the Debtor from Allen Suggs and were each issued 250 shares of the Debtor's stock.  (Debtor's Ex. 1). Also, as reflected in the January 2019 Annual Report, Dr. Sanders and Mr. Richardson are listed as the sole Officers/Directors of the Debtor (because the Debtor is a corporation vs. a limited liability company, the Court will refer to Dr. Sanders and Mr. Richardson as the shareholders of the company). (Debtor's Ex. 3).

[7] The Note provided for a five-year term, payable in equal monthly installments of $3,690.63.  (Movant's Ex. 6).

[8] Movant's Ex. 6.

[9] Movant's Ex. 5.

[10] In Dr. Sanders' 'Declaration," she states that she was not aware of the 2017 Note, and that when she agreed to purchase the Debtor, she believed the $650,000 payment was for "the business and the real property, free and clear from any of the debts previously incurred by [the Debtor]. (Movant's Ex. 7).

[11] Debtor's Ex. 4.

[12] The following year, in March of 2021, the Annual Report was updated to add Dr. Sander's husband, Leon Sanders, as the President of Maintenance.  (Debtor's Ex. 5).

Dr. Sanders owned and operated the Debtor until the conclusion of 2022, when she sold the Debtor to MAH, a holding company owned by Ms. Arflin and Mr. Suggs. On November 30, 2022, Dr. Sanders and MAH entered into a Purchase of Business Agreement (the "PBA").[13] Pursuant to the PBA, MAH was to pay Dr. Sanders $200,000 for the shares of the Debtor.[14]  The PBA further provided that the closing and sale of the shares was to occur on January 1, 2023, and that upon MAH paying the purchase price in full to Dr. Sanders, Dr. Sanders would:

  a.  provide [MAH] with duly executed forms and documents evidencing transfer of signing authority and control of the bank accounts of the [Debtor];

  b.  provide [MAH] with duly executed transfers of the Shares; and

  c.  deliver to [MAH] endorsed share certificates representing the Shares, and [Dr. Sanders would] take all steps necessary for the [Debtor] to enter [MAH] or its nominee, on the books of the [Debtor], as the holder of the Shares.

On January 1, 2023, the PBA was validly executed at the closing (the "Closing").[15]   In an ill-fated decision, Dr. Sanders proceeded with the Closing despite MAH's inability to fully fund the $200,000 purchase price.  As Dr. Sanders testified, she agreed to accept $100,000 towards the sale of the Debtor based on the agreement that the remainder of the purchase price would be paid over the course of the next year.  In addition to the PBA being signed and notarized, a "Share Subscription" document was signed on behalf of MAH by Ms. Arflin and provides in pertinent part:

  I hereby subscribe for 100 Class A Controlling shares in the capital stock of the Corporation at the price of $200,000.00 per share and tender herewith the sum of $200,000.00 USD in full payment of the subscription price for the shares.

---

[13] Debtor's Ex. 6.

[14] Id. at pgs. 2-3.

[15] Id. at pgs. 14-15.

> I request that the shares be issued to me, registered in my name, and that a certificate representing the shares be issued to me and delivered to my address, as shown above.[16]

A signed and notarized stock transfer document was also entered into by Dr. Sanders and Ms. Arflin.[17] Crucially, Dr. Sanders did not require an addendum to the PBA or any other legal instrument be executed to protect her interest in receiving the remaining $100,000 of the purchase price.

In addition to the above, Dr. Sanders gave Ms. Arflin the keys to the Debtor's property and all cash on hand.[18]  Moreover, Dr. Sanders testified that MAH (via Ms. Arflin) gained *exclusive* control of all incoming monies, credit card payments, Debtor's payroll system, and opened a new operating checking account for the Debtor to which Dr. Sanders did not have access to.  During MAH's operation of the Debtor, Dr. Sanders continued working for the Debtor as an independent contractor for "relief veterinarian" day shifts and was issued a Form 1099.  The change in ownership was also reflected in the Annual Report of May 2023, which lists Ms. Arflin as the Manager, Dr. Sanders as Secretary, and Leon Sanders as President of Maintenance.[19]

In early 2024, the relationship between Dr. Sanders and Ms. Arflin began to deteriorate. As Dr. Sanders testified, MAH failed to fully fund the remainder of the purchase price, resulting in a large deficit of approximately $80,000.  Additionally, Dr. Sanders testified that she became aware that the Debtor was not current on various financial obligations to trade creditors, as well as payroll for the relief veterinarians.[20] Due to the outstanding deficit and financial mismanagement

---

[16] Movant's Ex. 1.

[17] Movant's Ex. 2.

[18] The Debtor's cash on hand totaled approximately $30,000.  (Movant's Ex. 3, pgs. 23-24).

[19] Debtor's Ex. 7.

[20] Movant's Ex. 3, pgs. 15-16.

issues, Dr. Sanders testified that she began engaging in various self-help methods to regain control

of the Debtor. These actions included Dr. Sanders resuming her role in operating the Debtor's

business, changing the locks on the Property, and opening new bank accounts for the Debtor.

Additionally, Dr. Sanders amended the Debtor's Annual Report dated February 2, 2024, for the

purpose of re-titling her position from Secretary to Executive Secretary and removing Ms. Arflin's

name and position from the document.[21]

In September of 2024, the Movant brought various causes of action against the Debtor and

Dr. Sanders individually in the Circuit Court for the Fourth Judicial Circuit for Duval County,

Florida (the "State Court Case").[22] In the State Court Case, the Movant sought to commercially

foreclose upon the land and building used by the Debtor based on the 2017 Note in the amount of

$1,316,000, secured by an amended and restated mortgage on the Property.[23]

Although her testimony differed at the trial, Dr. Sanders acknowledged in a deposition

taken during the course of the State Court Case that she sold the Debtor to MAH in January of

2023, through a notarized and executed written agreement.[24] Dr. Sanders also testified at the trial

and a previous deposition that she did not prepare a 2023 income tax return for the Debtor because

she had sold the Debtor on January 1, 2023.[25] Movant therefore maintains that Dr. Sanders has

not owned the Debtor since January, 2023 and does not have the lawful authority to direct the

---

[21] The Court notes that a 2025 Annual Report was filed on May 12, 2025, which reflects the same information as the 2024 Annual Report. (D's Ex. 8).

[22] Shirley W. Spooner, Trustee, and Shirley W. Spooner, an individ. v. Marietta Animal Hospital, Inc et.al.., Case No.: 16-2024- CA-004923.

[23]  Movant's Ex. 7.

[24] Movant's Ex. 3, pg. 10.

[25] Movant's Ex. 3, pgs. 26-27.

corporation's affairs, appoint herself as its officer, or exercise any authority, including signing the petition for bankruptcy.[26]

## Conclusions of Law

The precise issue before the Court is whether Dr. Sanders had the corporate authority to file the petition for bankruptcy on behalf of the Debtor. Importantly, when "a voluntary petition for bankruptcy is filed [on] behalf of a corporation, the bankruptcy court does not acquire jurisdiction unless those purporting to act for the corporation have authority under local law 'to institute the proceedings.'" In re Mojo Brands Media, LLC, No. 6:15–bk–03871–CCJ, 2016 WL 1072508, at *1 (Bankr. M.D. Fla. Mar. 16, 2016) (quoting Price v. Gurney, 324 U.S. 100, 104 (1945)). Pursuant to 11 U.S.C. § 1112(b), a bankruptcy court shall dismiss or convert a bankruptcy case "for cause." It is well settled that, "[t]here is cause to dismiss a case if corporate authority to file for relief under the Bankruptcy Code does not exist." In re 301 W N. Ave., LLC, 666 B.R. 583, 594 (Bankr. N.D. Ill. 2025). Upon a court finding "that those who purport to act on behalf of the corporation have not been granted authority by local law to institute the proceedings, it has *no alternative but to dismiss the petition.*" Price, 324 U.S. at 106 (emphasis added). See In re Apex Brittany MO, LP, No. 23-11463 (CTG), 2023 WL 8205669, at *3 (Bankr. D. Del. Nov. 27, 2023) ("It is well established that a court must dismiss a bankruptcy case if the party acting on behalf of a corporate entity in filing the petition lacked the authority to do so.") (footnote omitted); In re Chicago South Loop Hotel Owner, LLC, 2023 WL 3643533, at *3 (Bankr. N.D. Ill. May 24, 2023), see also, In re NNN 123 N. Wacker, LLC, 510 B.R. 854, 858 (Bankr. N.D. Ill. 2014) ("In addition to 'cause' under § 1112(b), lack of corporate authority to file is an independent ground for dismissal of a bankruptcy case filed by a corporation.") (citation omitted).

---

[26] Doc. 15.

While the parties raise various arguments in support of their respective positions, the corporate authority issue can be resolved upon the consideration of: (i) whether the PBA is a valid contract between Dr. Sanders and MAH, (ii) whether the conduct and actions by Dr. Sanders and Ms. Arflin demonstrate their mutual assent that the sale was consummated, and (iii) whether Dr. Sander's self-help actions in attempting to regain control of the Debtor as the purported sole shareholder had any legal effect.  For the reasons set forth herein, the Court finds that Dr. Sanders did not possess the requisite corporate authority to file the petition for bankruptcy.

### A.    The PBA was a Valid Contract, and the Closing of the Debtor was Consummated

"Under Florida law, the question of whether a valid contract exists is a threshold question of law that may be properly decided by the court."  Kolodziej v. Mason, 774 F.3d 736, 740 (11th Cir. 2014).  "To prove the existence of a contract, a plaintiff must plead: (1) offer; (2) acceptance; (3) consideration; and (4) sufficient specification of the essential terms." Vega v. T–Mobile USA, Inc., 564 F.3d 1256, 1272 (11th Cir. 2009) (citing St. Joe Corp. v. McIver, 875 So.2d 375, 381 (Fla. 2004)).  A valid contract—premised on the parties' requisite willingness to contract—may be "manifested through written or spoken words, or *inferred* in whole or in part from the *parties' conduct*." L & H Constr. Co. v. Circle Redmont, Inc., 55 So.3d 630, 634 (Fla. 5th DCA 2011) (emphasis added) (internal quotation marks omitted).  "In case of ambiguity, a Florida court will take into account the parties' *conduct* as they execute their contract." In re WorldCom, Inc., No. 02-13533 (AJG), 2005 WL 3832065, at *7 (Bankr. S.D.N.Y. Dec. 29, 2005) (emphasis added).

As recognized by the Florida Supreme Court, courts may look to subsequent action of the parties to determine the interpretation that they themselves placed on the contractual language. LaLow v. Codomo, 101 So.2d 390, 393 (Fla. 1958); see also Integrated Health Servs. of Green Briar, Inc. v. Lopez-Silvero, 827 So.2d 338, 339 (Fla. 3rd DCA 2002) (finding that despite the fact

one party did not sign the contract, a valid contract existed based on the parties' actions). Further, "[a] party's failure to object to the manner of acceptance as being inconsistent with the terms of the agreement, operates as a waiver." <u>Fonseca v. Taverna Imports, Inc.</u>, 212 So. 3d 431, 441 (Fla. 3rd DCA 2017); <u>see also</u> <u>Caldwell v. Snyder</u>, 949 So.2d 1048 (Fla. 3rd DCA 2006); <u>Bush v. Ayer</u>, 728 So.2d 799, 802 (Fla. 4th DCA 1999) (concluding "that the only reasonable inference to be drawn from the undisputed evidence of appellees' conduct is that they waived strict compliance with the designated manner of acceptance of their counter-offer.").

Following a series of negotiations, Dr. Sanders and MAH clearly entered into a valid contract (the PBA) on November 22, 2022. The cornerstone of this Case therefore rises and falls on whether the January 2023 sale of the Debtor by Dr. Sanders to MAH was consummated, despite MAH's inability to fully fund the $200,000 purchase price. As set forth below, the evidence and testimony clearly answer this question in the affirmative.

The Court reaches this conclusion based upon the *totality* of Dr. Sanders' and Ms. Arflin's conduct and actions at the Closing and thereafter. Dr. Sanders testified at the hearing and in a previous deposition that she agreed to accept $100,000 at the Closing based on the agreement that the remainder of the $200,000 purchase price would be paid over the course of the following year. Although Dr. Sanders maintained at the trial that the closing was not consummated due to MAH's inability to pay the full purchase, this conflicts with her previous deposition testimony, in which she seemingly acknowledged that the Closing occurred.

Importantly, in addition to the signed and notarized PBA, a "Share Subscription" document was signed on behalf of MAH by Ms. Arflin, and a signed and notarized stock transfer document was also entered into by Dr. Sanders and Ms. Arflin.[27] These legal documents were

---

[27] Movant's Ex. 1.

executed without Dr. Sanders requiring an addendum to the PBA, or any other signed legal instrument, to protect her interest in receiving the remaining $100,000 of the purchase price.

As Dr. Sanders testified at the trial, she then proceeded to give Ms. Arflin the keys to the Debtor's property and all cash on hand. Moreover, MAH (via Ms. Arflin) gained *exclusive* control of all incoming monies, credit card payments, and the Debtor's payroll system. MAH also opened a new operating checking account for the Debtor, which Dr. Sanders acknowledged that she had *no* access to. These affirmative actions illustrate that Dr. Sanders and MAH were operating as if the sale had been consummated. Following the sale, Dr. Sanders primary connection to the Debtor was her consultant work as a "relief veterinarian," for which she was issued a Form 1099. Additionally, the Debtor's Annual Report of May 2023, listing Ms. Arflin as the Manager and Dr. Sanders as Secretary,[28] reflects the change in ownership.[29]

While the above actions by Dr. Sanders indicate the sale was consummated, the most telling evidence is Dr. Sanders' testimony at the trial and during a previous deposition that she did not prepare a 2023 income tax return for the Debtor because she had sold the Debtor on January 1, 2023.[30] Dr. Sanders is a highly educated and experienced businesswoman, and her acknowledgment as to why she did not file a 2023 tax return for the Debtor is emblematic of the fact that the sale was consummated at the closing.

### B.    Dr. Sander's Self-Help Actions to Regain Control of the Debtor had No Legal Effect

As the Court has found that the PBA was a validly executed contract and that the closing was consummated, it will next examine whether the self-help actions Dr. Sander's took to regain

---

[28] Debtor's Ex. 7.

[29] Based on the annual reports previously filed by Dr. Sanders, it is clear to the Court that she understood the significance of the change in ownership being reflected in the Annual Report of May 2023.

[30] Movant's Ex. 3, pgs. 26-27.

control of the Debtor because of MAH's failure to pay the remaining amount of the purchase price had any legal effect.

"It is well-settled that a bankruptcy filing is a specific act requiring specific authorization." In re Nica Holdings, Inc., 810 F.3d 781, 789–90 (11th Cir. 2015) (quoting In re N2N Commerce, Inc., 405 B.R. 34, 41 (Bankr. D. Mass. 2009) (quotation omitted) (collecting cases).    Whether a bankruptcy filing is properly authorized is determined by state law."  Id.; see also Price, 324 U.S. at 106 ("If the District Court finds that those who purport to act on behalf of the corporation have not been granted authority by local law to institute the proceedings, it has no alternative but to dismiss the petition.").  The Eleventh Circuit has recognized that, "Florida courts have long held that the authority to file a bankruptcy petition rests with a corporation's board of directors."  Nica Holdings, 810 F.3d at 90, see, e.g., In re Bel-Aire Invs., Inc., 97 B.R. 88, 89–90 (Bankr. M.D. Fla. 1989) ("There is no question that the authority to manage the affairs of the corporation does not include the right to file a petition for relief under any of the operating chapters of the Bankruptcy Code.").  In re Am. Int'l Indus., Inc., 10 B.R. 695, 697 (Bankr. S.D. Fla. 1981) (requiring "a specific resolution of the board of directors authorizing the action" in order to file a Chapter 7 bankruptcy petition).

The evidence reflects that Dr. Sanders single-handedly took back control of the Debtor through various self-help actions, declared herself the rightful owner, and proceeded to act as though she had the corporate authority to file the petition.  Dr. Sanders engaged in these actions despite the existence of the validly executed PBA, consummation of the sale to MAH, and the signed and notarized "Share Subscription" and "Transfer" documents.[31]  As of January 1, 2023, Dr. Sanders was divested of all legal authority to file a bankruptcy petition on behalf of the Debtor,

---

[31] Movant's Ex. 1.

and there is simply *no* evidence before the Court to conclude otherwise.[32]  Full stop.

<u>**Conclusion**</u>

The Court is sympathetic to Dr. Sanders' plight and understands how this saga unfolded when Dr. Sanders proceeded with the Closing and execution of the PBA and transfer of the Debtor's stock based solely on the verbal guarantees of MAH to pay the remainder of the purchase price. From the Court's vantage point, it is certainly understandable why the relationship soured when such promises did not materialize. Where the Court diverges, however, is that Dr. Sanders' decision to utilize "self-help" was not the appropriate remedy to rectify the breach, and her failure to take legal steps to protect her self-interest led to the twisted turn of events that transpired.

As the Court stated at the outset of this opinion, "the confines of the bankruptcy court should *never* be misappropriated as a vessel to unabashedly force a Debtor into bankruptcy without the corporate authority to do so."[33] Although the Court understands that Dr. Sanders was genuinely trying to save the Debtor from what was becoming a sinking ship, it does not alter the fact that Dr. Sanders simply did not possess the corporate authority to file the Chapter 7 petition on behalf of the Debtor.  The Court will enter a separate Order consistent with these Findings of Fact and Conclusions of Law.

---

[32] Dr. Sanders' unilateral act (when already divested of ownership) of filing an updated Annual Report in 2024, in which Ms. Arflin's name was removed from the document, has no force or effect as to Dr. Sanders' corporate authority to file and sign the bankruptcy petition.

[33] In re Monroe & King, P.A., Case No. 3:24-bk-02526-BAJ, Doc. 19, p. 1 (Bankr. M.D. Fla. Dec. 12, 2014).